## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **Connie M. Williams,** | ) | |
| | ) | **JURY DEMAND** |
| **Plaintiff,** | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | **Judge:** |
| **DePuy Orthopaedics, Inc.,** | ) | |
| **an Indiana Corporation and** | ) | |
| **Medical Device Business Services, Inc.,** | ) | |
| **an Indiana** | ) | |
| **Corporation** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT

---

Connie M. Williams (hereinafter "Plaintiff" or "Ms. Williams"), through her attorney, Chris Smith, DRS Law, hereby submit the following Complaint and Jury Demand against DePuy Orthopedics, Inc. now known as Medical Device Business Services, Inc., and states as follow:

### THE PARTIES & JURISDICTION

1.      At all times relevant to this action, Connie M. Williams was a resident of the State of Tennessee.

2.      At all times relevant to this action, DePuy Orthopaedics, Inc. ("DePuy") was a corporation organized and existing under the laws of the State of Indiana, with

1

its headquarters and principal place of business at 700 Orthopaedic Drive, Warsaw, Indiana, 46581, and duly licensed and authorized to conduct business within the state of Tennessee.

3.     At all relevant times, Defendant DePuy Orthopaedics, Inc. regularly conducted business in Tennessee.

4.     In March 2017, DePuy changed its entity name to Medical Device Business Services, Inc. ("MDBS").

5.     Defendant Medical Device Business Services, Inc., is an Indiana corporation with its principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46582, which is located in Kosciusko County. At all relevant times, Defendant Medical Device Business Services regularly conducted business in Tennessee.

6.     At all times, Defendants were the successor in interest, predecessor in interest, representatives, agent, coconspirator, servants, partners, joint-venturers, or alter egos of the other Defendants and were acting within the scope of such authority in such conspiracy, service, agency, affiliated relationship, partnership, and/or joint venture.

7.     Each Defendant was involved in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the

DePuy ATTUNE™ Knee System, as well as monitoring and reporting adverse events.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which Plaintiff resides.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in this District, and because Defendants conducted regular business in this District.

10.      Plaintiff resides at 108 Blue Hills Ct., (Metropolitan Davidson County) Nashville, TN 37214

## <u>GENERAL ALLEGATIONS</u>

11.      The knee is the largest joint in the human body, consisting of three individual bones: the shin bone (tibia), the thigh bone (femur), and the knee-cap (patella). The knee joint is lined with cartilage to protect the bones from rubbing against each other. This ensures that the joint surfaces can glide easily over one another. The human knee is a complicated joint which supports the entire body weight on four surfaces through a variety of motions essential to everyday life.

3

12.     People who suffer pain and disability from injury or damage to the knee joint may elect to have a knee replacement. Knee replacement technology can provide a solution to the pain and restore basic function.

13.     Total knee arthroplasty ("TKA"), also called total knee replacement ("TKR"), is a commonly performed orthopedic procedure. The surgery is designed to help relieve pain, to improve joint function, and to replace bones, cartilage and/or tissue that have been severely injured and/or worn down generally in people with severe knee degeneration due to arthritis, other disease, or trauma.

14.     In a total knee replacement surgery, physicians resurface the bone at the top of the shin (tibia) with a metal tray topped with a medical-grade plastic spacer, called a bearing.  This plastic replaces the cartilage, providing a cushioning surface for the new knee. The bottom of the thigh (femur) bone is resurfaced with a rounded metal part. This piece is designed to mimic the curve of the natural bone.   These components can be fixed to the bone by either using bone cement or a press fit, allowing the bone to grow into the coating on the implant.

**HISTORY OF THE ATTUNE™ SYSTEM and ATTUNE S+ SYSTEM**

15.     Defendants introduced the DePuy Synthes P.F.C. SIGMA System ("SIGMA system") in 1996.

16.     Notwithstanding Defendants' alleged success with the SIGMA system, the company altered the SIGMA system design in an effort to replicate the total

flexion of the natural knee and maintain a competitive position in the market. This new project resulted in the DePuy Attune™ Knee System, ("ATTUNE™ system").

17. Defendants represented that the DePuy Attune™ System "builds on the LCS Complete Knee System and the Sigma Rotating Platform Knee".

18. Defendants sought FDA clearance for the ATTUNE™ system through the "510(k)" process.

19. Section 510(k) of the Food, Drug and Cosmetic Act provides a mechanism for device manufacturers to obtain accelerated FDA clearance for products that are shown to be "substantially equivalent" to a product that has previously received FDA approval. The process requires device manufacturers to notify the FDA of their intent to market a medical device at least 90 days in advance of introduction to the market. This is known as Premarket Notification – also called PMN or 510(k). This approval process allows the FDA to determine whether the device is substantially equivalent to a device already approved for marketing.

20. In December 2010, Defendants received FDA clearance of the ATTUNE™ System under the "510k" approval process. The basis for FDA clearance was substantial similarity to several prior devices, including the SIGMA Knee System.

21.     Defendants received FDA 510(k) approval of the components of the ATTUNE™ system in 2010 and 2011 with limited testing of the new ATTUNE™ system.

22.     The ATTUNE™ system includes the Attune™ Tibial Base (510K Number K101433), also called the tibial tray, which, as compared to the SIGMA system, included a design change to the keel, the surface texture and/or finish of the tibial baseplate and "combined with new technology to treat the underside of the implant," among other changes.

23.     In March 2013, Defendants introduced its ATTUNE™ system, including procedures for implantation, to surgeons and consumers. On March 20, 2013, Defendants issued a press release widely introducing its "latest innovation in total knee replacement—the ATTUNE™ Knee System—at the 2013 American Academy of Orthopedic Surgeons (AAOS) annual meeting in Chicago."

24.     According to the Press release, the ATTUNE™ system was "designed to provide better range of motion and address the unstable feeling some patients experience during everyday activities, such as stair descent and bending." According to Defendants, its "proprietary technologies include: … SOFCAMTM Contact: An S-curve design that provides a smooth engagement for stability through flexion, while reducing stresses placed on the implant."

6

25.    Defendants claimed the ATTUNE™ system contained "new" technologies and that the ATTUNE™ system was one of the largest research and development projects in the history of the DePuy Synthes Companies, costing approximately $200 million. Defendants claimed the following features of the ATTUNE™ system: "the largest clinical program at DePuy," "improves value of TKA," "compares favorably in joint registries," and "significantly less symptomatic crepitus, primarily Sigma PS."

26.    DePuy represented to the public the ATTUNE™ system featured a gradually reducing femoral radius, an innovative s-curve design of the posteriorly stabilized cam, a tibial base which can be downsized or upsized two sizes versus the insert, novel patella tracking, lighter innovative instruments, and a new polyethylene formulation.

27.    According to Defendants, the ATTUNE™ system conferred greater mid flexion stability as the implanted knee moves from extension to flexion because of the more gradual change in the femoral component radius of curvature. According to DePuy, the new design features offered greater functional benefits and a greater range of movement as compared to other implants.

28.    DePuy represented to the public the new ATTUNE™ system improved functional outcomes, provided stability, improved patient satisfaction and improved operating room efficiency.

7

29.     However, the ATTUNE™ system did not deliver on these promises, resulting in significantly higher failure rates than previous Defendant knee counterparts due to the debonding of the tibial baseplate. As a result, thousands of knee replacement patients implanted with ATTUNE™ systems have had more expensive, more dangerous and less effective total knee replacement surgeries, and many have required or will require expensive and dangerous knee revision surgery to remove and replace the defective ATTUNE™ system.

30.     Since the initial launch, Defendants have continued to expand the ATTUNE™ system product line based on claims it would provide a more life-like knee to patients who were "expecting to maintain an active lifestyle." Defendants have successfully marketed the ATTUNE™ system and have become the dominant player in the knee market, upon information and belief, selling hundreds of thousands of ATTUNE™ systems worldwide.

31.     On March 10, 2016, Defendants submitted a Section 510(k) premarket notice of intent to market the ATTUNE Revised system, which included a new stem, with added length and a keel for additional stability and recessed cement pockets intended to promote cement fixation. The stem of the ATTUNE Revised system was designed with a cylindrical or tapered body geometry with a blasted and fluted fixation surface.

8

32.     Defendants requested FDA approval of the new tibial baseplate by application dated March 17, 2017, which was "prepared" by Defendants on March 16, 2016. The application requested clearance of a new tibial baseplate component as part of the Attune™ system, which was called the "Attune S+ Technology" ("ATTUNE S+") by Defendants. In particular, the application identified the design changes in the tibial base with the ATTUNE S+, including a newly designed "keel to provide additional stability," "recessed undercut cement pockets," and a "grit blasted surface for enhanced cement fixation" or microblast finish.

33.     The "Summary of Technologies" portion of the 510(k) application for the ATTUNE S+ tibial baseplate includes the following: The ATTUNE Cemented Tibial Base, FB provides a macro geometric feature and an optimized micro-blast finish which are both intended to aid in fixation of the tibial implant to the bone cement. The ATTUNE Cemented Tibial Base, FB is designed to enhance fixation by improving resistance (relative to the industry) to intra-operative factors which can result in a reduction in cement to implant bond.

34.     According to Defendants, the ATTUNE S+ tibial baseplate also features macro geometry and 45-degree undercut pockets designed to provide a macro-lock between the cement-implant interface. According to Defendants, the "ATTUNE S+ Technology finishing process increases the surface roughness compared with other,

9

DePuy Synthes clinically proven, tibial tray designs that were tested." See Depuy Synthes PowerPoint, "ATTUNE S+ Technology."

35.　By March 16, 2016, Defendants had recognized the existence of deficiencies in the design of the original ATTUNE™ system tibial baseplate, identified the deficiencies and/or mechanisms of failure associated with it, researched and designed the modifications to the new tibial tray/baseplate in the ATTUNE S+ system, conducted testing of this new tibial baseplate, as detailed in the application, and submitted the application to the FDA.

36.　DePuy revised the tibial base to improve cement attachment. The revisions included additional and deeper pockets on the back side of the tibial base and optimized surface conditions on the tibial base.

37.　Beginning in December 2016, Defendants began stating, in its responses in MAUDE failure reports, that the ATTUNE™ system was being improved in the revisions proposed in the 510(k) application.

38.　In response to MAUDE reports in 2016, Defendants reported it had "undertaken to investigate further" complaints of aseptic loosening in the ATTUNE™ system. DePuy stated: "The analysis and investigations eventually led to a new product development project, which will enhance fixation and make the product more robust to surgical technique." The ATTUNE S+ system was the new product referenced by DePuy.

10

39.     DePuy considered this response sufficient to address the concerns about aseptic loosening in the Attune™ system raised in the MAUDE failure reports.

40.     In response to MAUDE failure reports concerning the ATTUNE™ system, DePuy routinely stated: "investigation closed at this time. Should the additional information be received, the information will be reviewed, and the investigation will be reopened as necessary."

41.     The FDA approved Defendants' 510(k) clearance on the new ATTUNE S+ technology on June 15, 2017.

42. Between preparing the 510(k) application on March 16, 2016, and the FDA approval on June 15, 2017, of the ATTUNE S+ system, DePuy continued to market and sell the ATTUNE™ system without the modifications contained in the ATTUNE S+ system.

43.     Without notifying consumers, doctors, or patients, including Plaintiff and her physicians of the improvements in the tibial tray contained in the ATTUNE S+ system modifications, DePuy continued to market and sell the ATTUNE™ system without the modifications contained in the ATTUNE S+ system.

44.     Before August 2016, DePuy knew the improved design of the tibial base contained in the ATTUNE S+ system provided improved performance of the ATTUNE™ total knee replacement system.

45.     Before August 2016, DePuy knew the improved design of the tibial base contained in the ATTUNE S+ system reduced the risk of aseptic loosening at the interface of the cement and tibial base.

46.     Before August 2016, DePuy knew the improved design of the tibial base contained in the ATTUNE S+ system would reduce the risk of a second knee revision surgery.

47.     Defendants' strategic decision to design and obtain FDA 510(k) approval of the new and improved ATTUNE S+ tibial baseplate is an admission, or compelling evidence, the original Attune™ tibial baseplate is defective or has significant deficiencies.

48.     Defendants did not recall the tibial baseplate in the ATTUNE™ system or inform consumers and surgeons about the dangers of its use.

49.     Defendants knew about the deficiencies in the design of the original ATTUNE™ system tibial baseplate before the newly designed tibial baseplate (ATTUNE S+) was cleared in June 2017, yet DePuy failed to share this information with patients scheduled to have surgery to have the ATTUNE™ system implanted in their knee.

50.     Although Defendants knew about the high number of ATTUNE™ system failures resulting in revision surgeries before Plaintiff's implant surgery in July 2017, Defendants failed to warn surgeons, consumers, and patients, and allowed

12

the original, defective design to continue to be implanted by unsuspecting surgeons into unsuspecting patients including the Plaintiff.

51.     On March 15, 2017, DePuy Synthes, at the American Academy of Orthopaedic Surgeons ("AAOS") Annual Meeting in San Diego, California, announced the launch of the first ATTUNE Revision Knee System ("ATTUNE Revised system" or "ATTUNE S+ system"), which included the Attune Revision Fixed Bearing Tibial Base and a 14 x 50 mm Cemented Stem.

## FAILURES OF THE ATTUNE™ SYSTEM

52.     The primary reason the ATTUNE™ system fails is mechanical loosening. Mechanical loosening is sometimes referred to as "aseptic loosening".

53.     Mechanical loosening is caused by a failure of the bond between the tibial base and the implant cement.

54.     By August 2016, DePuy recognized, after the first two years, aseptic loosening was the most frequent cause of revision surgery for the rest of the implant life.

55.     By August 2016, DePuy recognized when the cement fails to bond to the tibial base it can result in mechanical loosening eventually leading to the need for a revision surgery.

56.     By August 2016, DePuy had received reports that when the ATTUNE™ system tibial base was extracted during a revision surgery it was observed and

13

reported that there was no attachment or bonding between the tibial base and the cement.

57.     By 2016, DePuy recognized mechanical loosening had occurred at an unprecedented rate in patients implanted with the ATTUNE™ system.

58.     Mechanical loosening of the tibial base can be visualized and diagnosed using radiographic imaging. The loosening between the cement and the tibial base can be evident from one or more radiolucent lines around the contours of the tibial base where the loosening is occurring.

59.     By August 2016, DePuy knew Mechanical loosening in an artificial knee generally causes pain, discomfort and ultimately the impairment in the function of the knee.

60.     By August 2016, DePuy knew that when a patient loses function in the knee it severely restricts a patient's daily activities.

61.     By August 2016, DePuy knew that once there is mechanical loosening of the tibial base, the patient may require a revision surgery to remove the knee implant and replace it with a new one.

62.     By August 2016, DePuy knew a failed total knee prosthesis often causes severe bone loss.

63.     By August 2016, DePuy knew revision surgeries are often more complicated and the patient has a greater period of recovery.

14

64.     By August 2016, DePuy knew the success rate of a revision surgery is much lower than that of the initial total knee replacement and the risks and complications are higher, including increased pain and limitations in range of motion.

65.     Beginning in 2013, Defendants became aware of issues with aseptic loosening in the components of the ATTUNE™ system. These concerns were evidenced through failure reports submitted to and kept in the FDA's Manufacturer and User Facility Device Experience (MAUDE), which houses medical device reports submitted to the FDA by reporters such as manufacturers, importers, and device user facilities.

66.     By August 2016, DePuy knew ATTUNE™ system design elements caused loosening and/or de-bonding at the tibial baseplate cement/implant interface.

67.     MAUDE reports detailed a high incidence of aseptic loosening at the tibial baseplate of the ATTUNE™ system resulting in subsequent revision surgeries.

68.     The FDA MAUDE database includes thousands of reported failures of the ATTUNE™ system with hundreds of reported revision surgeries.

69.     In 2017, the alarming rate of failure associated with the ATTUNE™ system due to debonding of the tibial baseplate was discussed in a paper written by Dr. Peter M. Bonutti and colleagues, entitled Unusually High Rate of Early Failure of Tibial Component in ATTUNE™ Total Knee Arthroplasty System at Implant-

15

Cement Interface. The article presented compelling evidence that the design and/or composition of the ATTUNE™ system, and particularly the tibial baseplate component, contribute greatly to de-bonding at the interface between the cement and the tibial baseplate, resulting in high rates of failure and revision surgery.

70.    The authors' intraoperative findings identified freely mobile tibial baseplates with loosening occurring at the implant-cement interface. In all tibial baseplate failures in the study, the tibial component had de-bonded and was easily separated from the cement mantle, while all the cement was strongly adherent to the tibial bone. On the femoral side, however, the cement was strongly adherent to the implant surface in all cases. The mean time to revision for those ATTUNE™ systems involved in the study was 19 months.

71.    The authors of the Bonutti study concluded that high rates of ATTUNE™ system failures due to de-bonding at the tibial-cement interface could be caused by a combination of factors, including the increased constraint of the ATTUNE™'s tibial polyethylene component; rounded edges and reduced cement pockets necessary for cement inter-digitation in the tibia, as compared to the DePuy SIGMA; reduced keel rotational flanges and/or stabilizers on the keel; and insufficient surface roughness of the tibial baseplate component.

16

## DEFENDANTS' MARKETING OF ATTUNE SYSTEMS

72.     According to Defendants, the ATTUNE™ system produces better stability of the knee in deep flexion, reduces the joint forces, and produces better patella tracking, operative flexibility and efficiency, and implant longevity. Defendants marketed the ATTUNE™ system based on these assertions. Despite these claims, large numbers of revision cases appeared in a short period resulting from the defects in the ATTUNE™ tibial baseplate.

73.     Defendants represented the ATTUNE™ Knee System patients had significantly greater range of motion than other knee replacement patients. Defendant represented that the ATTUNE™ Knee System helps you maintain stability during activities like walking and going up and down stairs.

74.     Defendants promised patients they could recover faster and engage in more active lifestyles. Contrary to Defendants' representations, however, the ATTUNE™ system is prone to failure, causing patients to experience additional pain and injury.

75.     Defendants designed, manufactured, tested, labeled, packaged, distributed, supplied, marketed, advertised, and/or otherwise engaged in all activities that are part of the sale and distribution of medical devices, and by these activities, caused the ATTUNE™ systems to be placed into the stream of commerce throughout the United States, including Tennessee.

17

76.     Defendants actively and aggressively marketed to doctors and the public that the ATTUNE™ systems were safe and effective total knee prostheses.

77.     From the time that Defendants first began selling the ATTUNE™ systems, the product labeling and product information for the ATTUNE™ system failed to contain adequate information, instructions, and warnings concerning the increased risk that the ATTUNE™ system fails at an extremely high rate.

78.     Despite Defendants' knowledge of the serious injuries associated with the use of the ATTUNE™ system, Defendants continue to engage in marketing and advertising programs which falsely and deceptively create the perception that the ATTUNE™ system is safe.

79.     Upon information and belief, Defendants downplayed the health risks associated with the ATTUNE™ system through promotional literature and communications with orthopedic surgeons. Defendants deceived doctors, including Plaintiff's surgeon, and potential users of the ATTUNE™ system by relaying positive information, while concealing the nature and extent of the known adverse and serious health effects of the ATTUNE™ system.

80.     Based on the design changes made to the original Attune™ tibial baseplate before it was put on the market, and the number of failures reported since it was launched, Defendants, through their premarketing and post-marketing

18

analysis, knew or should have known that the ATTUNE™ system was prone to fail. Plaintiff the ATTUNE™ system is defective and unreasonably dangerous.

## CASE SPECIFIC FACTUAL ALLEGATIONS

81.    Connie M. Williams developed bone on bone arthritis in both her knees. On July 17, 2017, Dr. Gregory Raab implanted the ATTUNE™ Knee System in both of Ms. William's knees at Ascension St. Thomas Hospital Midtown in Nashville, Tennessee.  The surgical procedure was a Total Knee Joint Replacement.

82.    Plaintiff's total right and left knee joints were removed and replaced by the ATTUNE™ Knee System manufactured and marketed by the Defendants.

83.    Plaintiff was a proper candidate for the Total Knee Joint Replacement.

84.    Dr. Gregory Raab implanted the Attune™ Tibial Base Fixed Bearing and Attune™ Tibial Insert Fixed Bearing Cruciate Retaining components in Plaintiff's knees.

86.    Dr. Raab implanted the Attune™ tibial base using DePuy CMW 2 Bone Cement.

87.    Dr. Raab properly followed the DePuy instructions, training, and procedures when he implanted the ATTUNE™ Knee System into Ms. Williams's right and left knees.

19

88.     Dr. Raab properly followed the DePuy instructions, training, and procedures when he applied the DePuy CMW2 Bone Cement into the tibia of Ms. Williams's right and left knees.

89.     A representative of DePuy attended the surgery and observed the implantation of the ATTUNE™ Knee System into Ms. Williams's right knee.  The DePuy representative approved Dr. Raab's surgical procedure when he implanted the ATTUNE™ Knee System.

90.     There was nothing in the surgical procedure used by Dr. Raab that caused or contributed to the subsequent failure of the ATTUNE™ Knee System he implanted in Mrs. Williams's right and left knees.

91.     Neither Ms. Williams nor her physicians were aware, by warning or notice of the defects in the ATTUNE™ system and would not have used the ATTUNE™ system had they been aware of the defective nature of the device.

92.     DePuy did not inform Ms. Williams nor Dr. Raab that DePuy had revised the ATTUNE™ System and that DePuy had already received FDA approval for the revised features in the Tibial base in the ATTUNE S+ System.

93.     Contrary to these claims, the ATTUNE™ Knee System was in fact prone to premature failure and dislocation and to cause patients to experience great pain and instability. In addition, the glue used to adhere the parts was known to fail, cause patients to feel a slipping sensation and instability.

20

94. After four and half years after the ATTUNE™ systems were implanted, Ms. Williams was experiencing severe and persistent pain, discomfort, swelling, instability, and difficulty ambulating.

95. Ms. Williams returned to Dr. Gregory Raab complaining of constant pain with swelling, difficulty ambulating, and she was walking with a limp. She complained of pain twenty-four hours a day and seven days a week. Her range of motion was quite limited, and she reported being miserable due to the pain. Dr. Raab found no evidence of infection or that Ms. Williams's complaint of pain in her right and left knee was caused by trauma since the surgery.

96. Dr. Raab ordered a bone scan. Ms. Williams had the scan on August 9, 2022, at Premier Radiology. On August 12, 2022, Ms. Williams met with Dr. Raab and he informed her the bone scan showed that both implants had failed. Dr. Raab recommended she have revision surgeries on both knees.

97. On January 4, 2023, Dr. Raab performed revision surgery on Ms. Williams's left knee at Ascension St. Thomas Hospital Midtown in Nashville, Tennessee.

98. During the revision surgery, Dr. Raab observed the tibial base came free from the tibia with little or no force. He also observed the cement did not bond or adhere to the tibial base. When the tibial base was removed from Plaintiff's tibia,

21

the tibial base left an impression in the cement mantle in the shape of the keel of the tibial base.

99.    Dr. Raab's observations during the revision surgery are the same as the findings of other surgeons during revision surgeries on the ATTUNE™ system.

100.   On May 10, 2023, Dr. Raab performed revision surgery on Ms. William's right knee at Ascension St. Thomas Hospital Midtown in Nashville, Tennessee.

101.   During the revision surgery, Dr. Raab again observed the tibial base came free from the tibia with little or no force. He also observed the cement did not bond or adhere to the tibial base. When the tibial base was removed from Plaintiff's tibia, the tibial base left an impression in the cement mantle in the shape of the keel of the tibial base.

102.   Dr. Raab's observations during the revision surgery are the same as his observations during the revision surgery on the left knee.

103.   His observations are also the same as the findings of other surgeons during revision surgeries on the ATTUNE™ system.

104.   Prior to August 2016, Surgeons had reported to DePuy that during revision surgeries they observed the tibial base coming from the tibia with little or no force. They observed the cement did not bond or adhere to the tibial base. They also observed when the tibial base was removed from patient's tibia, the tibial base left an impression in the cement mantle in the shape of the keel of the tibial base.

22

105.   Dr. Raab concluded the failure of the cement bonding to the tibial base caused aseptic or mechanical loosening in the ATTUNE™ knee system in both of Ms. Williams' knees.

106.   Prior to August 2016, DePuy was aware that other surgeons during revision surgeries had reached the conclusion the failure of the cement bonding to the tibial base caused aseptic or mechanical loosening in the ATTUNE™ knee system

107.   Dr. Raab concluded the failure of the ATTUNE™ knee system was the sole cause of Ms. Williams' knee revision surgeries.  But for the failure of the ATTUNE™ knee system Ms. Williams would not have required the knee revision surgeries.

108.   As a direct and proximate result of Defendants placing the ATTUNE™ system in the stream of commerce, Ms. Williams has suffered and continues to suffer both injuries and damages, including, but not limited to: past, present and future physical and mental pain and suffering; and past, present and future medical, hospital, rehabilitative, monitoring, and pharmaceutical expenses, economic damages, temporary and permanent disability, severe and possibly permanent injuries, and other related damages.

109.   All of the injuries and complications suffered by Plaintiff were caused by the defective design, warnings, construction, and unreasonably dangerous

character of the ATTUNE™ system that was implanted in her. Had Defendants not concealed the known defects, the early failure rate, the known complications, and the unreasonable risks associated with the use of the ATTUNE™ system, Ms. Williams would not have consented to the ATTUNE™ system being used in her total knee arthroplasty.

110.  The ATTUNE™ Knee System was used for the purpose for which it was designed, intended and marketed and, at the time it failed and injured Ms. Williams, was not materially changed in any way from the condition it was in when sold by the Defendants.

## FIRST CLAIM FOR RELIEF
### (Strict Liability)

111.  Plaintiff incorporates all other allegations of this complaint as if fully rewritten.

112.  Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

113.  Defendant designed, manufactured, promoted, distributed, marketed, and sold the ATTUNE™ Knee System that was implanted in Plaintiff's left and right knees.

114.  At all times relevant, Defendants were in the business of selling ATTUNE™ Knee System for use by and upon consumers.

115.   At all times relevant, the ATTUNE™ Knee system that Plaintiff received was in a defective and unreasonably dangerous condition. Such condition included, but is not limited to, one or more of the following particulars:

a.   The ATTUNE™ Knee system that Plaintiff received contained design defects including but not limited to, mechanical loosening and failures due to de-bonding at the tibial-cement interface: including the increased constraint of the ATTUNE™'s tibial polyethylene component; rounded edges and reduced cement pockets necessary for cement inter-digitation in the tibia; reduced keel rotational flanges and/or stabilizers on the keel; and insufficient surface roughness of the tibial baseplate component.

b.   The ATTUNE™ Knee system design of the implant subjected Plaintiff and others to risks, including the risk that Plaintiff would develop inflammation, swelling, and bone loss, as a result of the implant, causing the implant to prematurely fail, and requiring Plaintiff to undergo a complex risky, and painful surgery to remove and replace the defective implant.

c.   Safer alternative designs existed, including the design of the ATTUNE S+ system and the design of the device used during Plaintiff's revision surgery.

25

d.     The likelihood of the ATTUNE™ Knee system causing injuries of the sort Plaintiff sustained was high, given the significant number of persons who experienced loosening and ultimate failure of the implant.

e.     Neither the ultimate consumer – Plaintiff, in this case – nor her health care providers had the ability to avoid via exercise of reasonable care the consequences that befell Mrs. Williams in this case because they did not know and had no reason to know of the defects in the implant.

f.     As detailed further below, the ATTUNE™ Knee system lacked any warnings or instructions that might have ameliorated the risks that resulted in Plaintiff's injuries and revision surgery.

g.     The ATTUNE™ Knee system that Plaintiff received was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff's health care providers, including Dr. Raab, of the full nature or extent of the risks associated with its use. The ATTUNE™ Knee system was not accompanied by a warning which specifically and fully informed Plaintiff's health care providers of the risks of mechanical failure and de-bonding associated with the implant.

116.   Defendant knew or should have known of the dangers associated with the use of the ATTUNE™ Knee system as well as the defective nature of the

26

ATTUNE™ Knee system. Such knowledge is evidenced by facts including, but not limited to:

a.      Defendant submitted a 510k application to the FDA to revise the ATTUNE™ Knee System that improved the tibial base component.

b.      Defendant performed extensive review of the revisions to the tibial base component of the ATTUNE™ Knee System and knew the tibial base component would be improved by the proposed revisions to the tibial base component contained in the 2016 510k application.

c.      The proposed revisions to the tibial base component served to improve the stability of the tibial base component and reduce the risk of aseptic debonding between the cement mantle and the tibial component.

d.      Current medical literature documenting a causal link between the ATTUNE™ Knee System and inflammation, swelling, bone loss, and de-bonding.

e.      Prior lawsuits against Defendants alleging that the ATTUNE™ Knee System (or other similar implants) caused patients to suffer mechanical failure, inflammation, swelling, bone loss, and de-bonding.

117.   The ATTUNE™ Knee System was in the above-described defective and unreasonably dangerous condition at the time Defendants placed in the stream of commerce.

27

118. The ATTUNE™ Knee System were expected to reach, and did reach, prescribing physicians and consumers, including Plaintiff, without substantial change in the condition in which they were sold.

119. At all times relevant, Plaintiff was a person in need of an artificial knee implant and thus a person Defendants should reasonably have expected to receive the ATTUNE™ Knee System.

120. Plaintiff and her medical providers used the ATTUNE™ Knee System as directed, and for their intended purposes.

121. At all times relevant, the ATTUNE™ Knee System was defective, and Defendants knew that they were to be used by consumers without inspection for defects therein. Moreover, neither Plaintiff nor her health care providers knew or had reason to know at the time of the use of the subject products, of the existence of the aforementioned defects. Neither Plaintiff nor her physician could have discovered the defects in the ATTUNE™ Knee System through the exercise of reasonable care.

122. The ATTUNE™ Knee System was not materially altered or modified prior to their use in Plaintiff.

123. The acts of Defendants were the cause of the injuries, damages, and losses of the Plaintiff.

## SECOND CLAIM FOR RELIEF
### (Negligent Products Liability – All Defendants)

124. Plaintiff incorporates all other allegations of this complaint as if fully rewritten.

125. Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

126. Defendants designed, manufactured, promoted, distributed, marketed, and sold the ATTUNE™ Knee System that injured plaintiff.

127. At all times relevant, Plaintiff was a person in need of an artificial knee implant and thus a person Defendants should reasonably have expected to receive the ATTUNE™ Knee System.

128. At all times relevant, Defendants negligently failed to exercise reasonable care to prevent the ATTUNE™ Knee System from creating an unreasonable risk of harm to persons, including Plaintiff, who were using the device in a manner and for a purpose for which it was made. Such negligence included but is not limited to the following: a. Designing, manufacturing, promoting, distributing, marketing, and selling the ATTUNE™ Knee System prosthetic knee implant despite knowledge the prosthetic knee implants pose a risk of mechanical failure, inflammation, swelling, bone loss, and de-bonding. b. Failing to ensure that the ATTUNE™ Knee System was accompanied by specific warnings and/or instructions sufficient to fully inform consumers, including Plaintiff, of the risks of

29

mechanical failure, inflammation, swelling, bone loss, and de-bonding associated with the implant. c. Failing to ensure that the ATTUNE™ Knee System was accompanied by specific warnings and/or instructions sufficient to and fully inform physicians, health care providers and other consumers, of the risk that they might have an adverse reaction to the implant. d. Failing to conduct adequate testing to determine whether the ATTUNE™ Knee System, with its design and construction, would mechanically fail or de-bond in a significant number of recipients.

129.   The acts of the Defendants were a cause of the injuries, damages, and losses of the Plaintiff.

## THIRD CLAIM FOR RELIEF
### Breach of Implied Warranties – All Defendants)

130.   Plaintiff incorporates all other allegations of this complaint as if fully rewritten.

131.   Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

132.   Prior to the time that the ATTUNE™ Knee System was used by Plaintiff's surgeon and healthcare providers, Defendants impliedly warranted to Plaintiff that the ATTUNE™ Knee System was of merchantable quality and safe and fit for the use for which it was intended.

133.   Plaintiff's surgeon and healthcare providers did not research, design or manufacture medical devices such as the ATTUNE™ Knee System. Plaintiff's

surgeon and healthcare providers reasonably relied on the skill, judgment, and implied warranties of Defendants in deciding to use the ATTUNE™ Knee System on their patients, including Mrs. Williams.

134. The ATTUNE™ Knee System was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user. Specifically: a. The mechanical failure of the ATTUNE™ Knee System subjected Plaintiff and others to risks, including the risk that Plaintiff would develop inflammation, swelling, bone loss, and de-bonding because of the implants, causing the implants to prematurely fail, and requiring Plaintiff to undergo complex risky, and painful surgeries to remove and replace the defective implants. b. The ATTUNE™ Knee Systems that Plaintiff received was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff of the full nature or extent of the risks associated with its use. The ATTUNE™ Knee Systems were not accompanied by a warning which specifically and fully informed Plaintiff of the risks of mechanical failure, inflammation, swelling, bone loss, and de-bonding associated with the implants.

135. Defendants, by selling, delivering and/or distributing the defective ATTUNE™ Knee System to Plaintiff breached the implied warranty of

31

merchantability and fitness and caused Plaintiff to suffer severe pain and emotional distress, incur medical expenses and incur a loss of earning capacity.

136. The acts of the Defendants were a cause of the injuries, damages, and losses of the Plaintiff.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Express Warranty – All Defendants)**

137. Plaintiff incorporates all other allegations of this complaint as if fully rewritten.

138. Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

139. At all times relevant, Defendants expressly warranted to Plaintiff's physicians, surgeons, and other healthcare providers, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients, and the general public, that the ATTUNE™ Knee System was safe, effective, fit, and proper for its intended use.

140. Plaintiff's physicians, surgeons and healthcare providers are not involved in the research, design, and manufacture of medical devices such as the ATTUNE™ Knee System Plaintiff's physicians, surgeons and healthcare providers reasonably relied entirely on the skill, judgment, representations and foregoing express warranties of Defendants in using the ATTUNE™ Knee System.

32

141. Said representations and warranties were false in that the ATTUNE™ Knee System was not safe, effective, fit, and proper for its intended use in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user. Specifically: a.) The design of the ATTUNE™ Knee System subjected Plaintiff and others to risks, including the risk of mechanical failure, that Plaintiff would develop inflammation, swelling, bone loss, and de-bonding as a result of the implant, causing the implant to prematurely fail, and requiring Plaintiff to undergo complex risky, and painful surgeries to remove and replace the defective implants. b.) The ATTUNE™ Knee System that Plaintiff received was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff of the full nature or extent of the risks associated with its use. The ATTUNE™ Knee System was not accompanied by a warning which specifically and fully informed Plaintiff of the risks of mechanical failure, inflammation, swelling, bone loss, and de-bonding.

142. The acts of the Defendants were a cause of the injuries, damages, and losses of the Plaintiff.

## FIFTH CLAIM FOR RELIEF
### (Breach of Duty to Warn – All Defendants)

143. Plaintiff incorporates all other allegations of this complaint as if fully rewritten.

144. Plaintiff suffered injuries, damages, and losses in amounts to be proven at trial.

33

145. At all times relevant, Defendants had a duty to warn prospective patients and physicians, surgeons, and other healthcare providers, that the ATTUNE™ Knee System particularly the tibial base was not safe, effective, fit, or proper for its intended use.

146. Defendants failed to warn that the cement would debond from the tibial baseplate and cause the device to loosen over time ultimately requiring revision surgery to replace the ATTUNE™ Knee System.

147. Defendants failed to warn that the ATTUNE™ Knee System would fail causing severe pain and discomfort.

148 Defendants specifically failed to warn: a.) The design of the ATTUNE™ Knee System subjected Plaintiff and others to risks, including the risk of mechanical failure, that Plaintiff would develop inflammation, swelling, bone loss, and de-bonding as a result of the implants, causing the implants to prematurely fail, and requiring Plaintiff to undergo complex risky, and painful surgeries to remove and replace the defective implants. b.) The ATTUNE™ Knee System that Plaintiff received was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff of the full nature or extent of the risks associated with its use. The ATTUNE™ Knee System was not accompanied by a warning which specifically and fully informed Plaintiff of the risks of mechanical failure, inflammation, swelling, bone loss, and de-bonding.

148.  At all times relevant, Defendants had a duty to warn prospective patients and physicians, surgeons, and other healthcare providers, that Defendants had revised the tibial base of the ATTUNE™ Knee System to improve the stability of the device and to prevent the failure of the cement to bond with the tibial base.

149. Defendants continued to market the ATTUNE™ Knee System knowing they had substantially redesigned the tibial baseplate to improve stability.  Despite knowing they had revised the product, Defendants failed to warn Plaintiff and her physicians that there was another improved version of the ATTUNE Knee System superior in design to the ATTUNE™ Knee System implanted in her knees.

150.  Defendants failure to provide warnings to Plaintiff caused her to agree to the implanting of the ATTUNE™ Knee System.  As a result, the failure to warn and other of the Defendants were a cause of the injuries, damages, and losses of the Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount that will compensate Plaintiff for all injuries, damages, and losses. Plaintiff prays for interest, both statutory and moratory, from the date of injury before and after judgment. Plaintiff prays for an award of costs, expert witness fees, reasonable attorney fees, and all other appropriate relief. Plaintiff reserves the right to amend this Complaint

35

to add a claim for punitive damages at the appropriate time. Any further legal and equitable relief that the Court deems just and proper.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES AND

CLAIMS, INCLUDING ALL CLAIMS AND CROSS-CLAIMS.

Respectfully submitted,

DRS LAW

*s/ Christopher Smith*
By: _____
    Christopher Smith
    TN Bar #034450
    DRS Law
    1913 21st Ave. South
    Nashville, TN 37212
    Phone: (615) 742-1775
    Fax: (615) 742-1223
    Email: csmith@drslawfirm.com